Good morning. May it please the Court. Philip DeRosier appearing on behalf of the Plaintiff Appellant National Presto Industries. If I may, I'd like to please reserve two minutes for rebuttal. I will keep track of my own time, of course. So we believe that the District Court erred in two respects. First, that the District Court deprived Presto of its Seventh Amendment right to a jury trial. And second, having decided to hold a bench trial, we think that the Court clearly erred in finding that Presto failed to prove infringement of its trade dress. Beginning with the Seventh Amendment issue, so here the District Court held that Presto's request for discouragement under the Lanham Act was an equitable remedy and that there was no right to a jury trial. Now, as we discussed in our brief, of course, there's no doubt that sometimes discouragement of profits can be an equitable remedy if it's — if the or perhaps to deter future infringement. But as we discussed in our brief, there are a number of courts that have recognized that discouragement of profits — Before — Yes, Your Honor. I have kind of a threshold question here. This is unregistered trade dress. It is. So Samara applies. You must prove secondary meaning. Yes. Is that a question of law or fact, the ultimate question? The — those are factual findings with respect to whether the — Secondary — secondary meaning is a factual finding or its components are? Well, the — I guess what I would say is the — I mean, my understanding is that everything that goes into whether trade dress has been infringed is a matter of finding a fact for the fact finder. Well, you know, there are all kinds of mixed questions of facts, right? And they don't necessarily automatically entitle you to a trial by jury, right? Because there are certain preconditional fact questions that courts are required to decide before they can ultimately decide the legal question, right? And so I think that it is an interesting question whether or not there's a — infringement is a legal question or a fact question or a mixed question. I don't think it's a pure fact question, you know? And the question is, if it's mixed, how mixed is it? And then what did it look like at common law, you know? Well, I think to your point, Your Honor, about it being perhaps mixed, I mean, yes, as someone were to walk through the elements of trade dress infringement, certainly there are — you know, there are significant legal requirements. But I guess what I would — what I would point to is the fact that juries commonly do decide trade dress infringement. Those questions about secondary meaning, those questions about likelihood of confusion, those things are often decided by jury. And then I also — I have to confess that I was often confused about that question as a trial judge, and  But I always viewed the jury's opinion as advisory, and I always accepted the fact findings they made. But I mean, I think it's a — it's a closer question. And certainly the jury — certainly district courts have the discretion to use the jury's verdict as advisory under the Lanham Act. I would agree with that. But I also, when I come back to thinking about, you know, whether it's quintessentially, ultimately a factual determination that needs to be made, you know, you even look at the comes down to, is there sufficient evidence to create a question of fact on the elements of trade dress infringement. This, of course, is potentially determinative of your Seventh Amendment argument. It is. Well — Because if there was a full bench trial and a decision, finding or conclusion, that you didn't prove — your client didn't prove secondary meaning. Now, that makes the — whether that was a bench trial or a jury trial doesn't matter, does it? Well, that's where I think we need to kind of — You don't get a second run at the apple just for that. I think if we were deprived of the right to a jury trial, I do think that would be the appropriate remedy. And I guess what I'd like to do is sort of rewind to — Wait a minute. You know, you — you haven't — you haven't — you haven't — all right. I understand that it's — I understand it's — This is not in the briefs, and if you don't have authorities, we'll look them up ourselves. Well, I do — I do understand that it's a significant ask that a case that has gone to the bench — to a bench trial because the district court denied the request for a jury trial, that that — that is — would be a significant undertaking to redo that. But I do think that, you know, the issue of the — The question is, is it preclude — is it — is it precluded? I don't — well, I'm not aware of any authority — yeah, to your point, Your Honor, nobody has made an argument that it's precluded, and I'm not aware of any authority — I'm not — I'm not arguing. I'm raising the question. No. I'm finding if you have authorities, fine, we'll — otherwise, we'll go find them. I'm not aware of authority that — that — that sending the case back for a jury trial is — is precluded at this point. I mean, the issue of the Seventh Amendment right was — was preserved prior to trial. You made a demand, made an objection, and it's preserved. The question is, were you entitled to it under common law or under the Lanham Act itself? And that's — yeah, and that's where I guess I'd really like to focus our attention, because obviously, we spent a lot of time in the brief talking about this idea that when disgorgement of profits, which can be an equitable remedy in the — in the infringement context, and it's a — you know, it's trademark, patent, copyright, it's been recognized in all of these settings. When the remedy being requested — because under the Supreme Court's test, and the more important part of the test is to look at the remedy that's being requested. If it's equitable, then there's no Seventh Amendment right to a jury trial. If it's legal in nature, then there is a right to a Seventh Amendment jury trial. And so we're — we're relying on this — this concept that's been accepted by a lot of courts, which is that in a situation like we have argued exists here, when the infringer's profits are a rough, or we call it — you know, it's commonly referred to as a proxy measure of the plaintiff's damages, that's what makes the remedy legal. Because — Well, you know, it does. But, you know, it's an equitable remedy in the sense that it shifts the burden, essentially, right? So you've got the burden of proving the damages, right? Just, you know, as you're the plaintiff, I prove my damages, I prove them up, I have to present evidence. But disgorgement of profits, you're the — the burden is on the other side to show what the profits were, right? And so it's easier — listen, I'm an old plaintiff's lawyer. It's easier to get disgorgement of profits, prove that up, because you don't have the burden as heavily laying upon you as you do if you have to say, well, I lost sales, I've lost, you know, goodwill, I've lost — you know, you get where I'm going, right? Now, your paragraph 174, which is right before the ultimate prayer for relief, is ambiguous because it says, we want disgorgement and our damages, right? And you know, the claim is, is that, well, what you really sought was only disgorgement. And it seems your prayer actually says something slightly different. The question is, what did you actually offer in proof as to your damages? So certainly, when you go all the way back to the complaint, I acknowledge that the prayer for relief is — it was certainly broadly stated. But then as the case progressed, and as we headed into the issue that the district court requested, you know, specifically briefing on, well, you know, is there a basis for sending this to a jury? And that's where we pointed to the fact that through discovery, through the exchange of expert reports, what Presto had consistently articulated was the idea — The question was, your proof at the bench trial. Well, but that — How was that — how was that framed? Well, Your Honor, that's where I think that that sort of puts the — I think you need to go back. I don't know if cart before the horse is the right saying there. But I think the problem is, is that the determination of whether a jury trial should have been held — Give us a second bite at the apple. So don't — let's not worry about what happened at the bench trial. Give us — give us a — give us a new one. But the evidence presented at the trial — Criminal case. But the evidence that's presented at the trial, it does — you know, it is impacted by the fact that here, you know, the parties knew there would be a bench trial. But I want — but I think the direct answer to your — Well, whether it's a bench trial or not, the question is, what did you offer as proof of damages, right? I mean, because in the great big universe, you can seek discordsman of profits. You can prove your own lost sales. You can prove a damage to your reputation. You can prove confusion and lost sales outside of the ordinary chain. You can prove, you know, all sorts of different things. And what evidence was offered in that regard? Sure. So both — and this is both pretrial and at trial. And it's what we think makes this case significant. And the district court even acknowledged in denying the jury trial right the idea that this is a case where we did have evidence and provided evidence of harm. The only difference here is that measuring the harm, we did not approach it in terms of looking at National Presto's own lost profits. So the theory here — and this is what's been recognized by a number of courts — is that when you can prove — and the evidence at trial showed this — it's the sales. It's when, for example, here, the products were directly competing. The heat machine came in and it replaced the heat dish at Costco stores in the markets that are at issue. And so we know that those sales — and that's what the evidence at trial focused on — we know that those sales would have gone to Presto if it weren't for the substitute heater having been purchased by Costco, again, for these select stores. Which means you should have had a unit, you know, cost loss, which you could have proven. But you elected to go with disgorgement of profits. And see, the problem with that is disgorgement of profits is actually a remedy, I think, in quantum merit. And it is, in fact, the theory that one would disgorge the profits because of an unjust enrichment, right? Isn't that the underlying common law theory? And that if, in fact, you don't prove up your contract damages, aren't you really sitting in a land of restitutionary remedy? And in that restitutionary remedy, aren't you exactly looking at something that would historically, at common law, have been an equitable claim? Not — I would say, Your Honor, not necessarily. It's not necessarily and always an equitable claim. Again, when — and I guess I would also point to — we discussed, you know, the Supreme Court's Dairy Queen opinion in our case, which I acknowledge is not — you know, it's not sort of the beacon of clarity on what we're talking about today. But there was a situation where you had a plaintiff that was — that brought both a breach of contract claim in that case as well as a trademark infringement claim. And as part of the relief that was being requested was an accounting for profits that the defendant earned in violation of the trademark. And so the Supreme Court said that in that situation, the court had no problem saying that that is, under those circumstances, it is effectively a damage remedy. Well, do you agree that it's a case-by-case determination depending on the circumstances? I would agree with that, Your Honor. And that's why we think it's so important here to focus on the case law that addresses the notion of using the defendant — the infringing defendant's profits as a measure of the plaintiff's own damages. The plaintiff does have to show that there were lost sales. It does have to show — you know, whatever — whatever, you know, proof mechanism you choose to do that. But there needs to be a viable theory for why you're looking at the infringer's profits. And it's not always going to be easy to do. And it's not always the case that plaintiffs ask for it. So the cases that have rejected the proxy theory — and again, you know, we go through these in our brief — they all involve situations that were quite different than ours. They were either situations where the plaintiff expressly stated that they were seeking, you know, discordsmen under an unjust enrichment theory, or they disclaimed the ability to show lost sales, or they disclaimed the ability to show harm. But that's not our case. And I think — you know, I appreciate that it's a District Court of Illinois decision, but we spent a lot of time talking about that Black and Decker case, right? I really think that's worth taking a look at, because I think the Court in that case did a very, very good job at carefully analyzing this idea, which does have historical roots. I mean, we cited cases from the Third and Fifth Circuits, you know, back in the 60s that recognized historically this idea that — because, you know, in trademark infringement cases, as we know, you know, they could be brought at law, they could be brought in equity. The only time you saw accounting of profits typically historically in an equity court is if — and it's, you know, usually the case, right? If you're seeking — Request 1292B certification on this? We did request 1292B certification, and it was denied. Which court denied it? The District Court denied it. Yes, Your Honor. So I — so, again, I really do think — and I see I'm starting to cut into my rebuttal time, and I certainly — you know, I'm here to answer your questions. But I think that, like I said, I think really the key — the key to understanding this is looking at the circumstances of this case. So just really briefly on trade dress infringement, you know, we think the right under the Seventh Amendment, we still think reversal is required even if a bench trial was appropriate here. And we appreciate the clearly erroneous standard of review and what that requires. We do think it's met here. You know, just briefly on the trade dress infringement, you know, look, we think that the — that Presto presented substantial evidence that U.S. merchants engaged in deliberate copying of distinctive, non-functional trade dress. And particularly, as we focus in the brief, it's this bundt cake-shaped grill with a recess center. At the time that it went on sale at Costco, more than 30 years ago, it was the only parabolic heater that looked like that. Went through the process of the millions of dollars of sales. When the heat machine came onto the scene, the initial version of it, right, was not — didn't look anything like the heat dish, but then Costco rejected that version. So U.S. merchants went back and redesigned it, made the grill look more like the Presto unit. We cite the e-mails that that was actually the intent. And so, of course, that — you know, that deliberate copy, not only does it — not only does it support secondary meaning, as well as the other things I mentioned that we discussed in our brief about the, you know, exclusive use of that specific design for many years, Costco recognized how significant it was. It wanted a heater that looked just the same, and that's what U.S. merchants provided. And then that copying, of course, we think, created a likelihood of confusion, naturally, because Costco members go and they see the heat dish one year, and then the next year the heat dish is gone and the heat machine is there. It looks just the same. Nobody would ever have any reason to know that they came from a different source, and so we think that's really the key to the likelihood of confusion factor. And so I don't think you need to second-guess any findings of fact to reach that conclusion. I think you just need to walk through the elements of trade dress infringement and see how fundamentally these things that I mentioned really do add up, in our view, quite plainly to clear error. And I see I'm out of time, so I will stop talking unless you have any questions for me. Okay. Thank you. Mr. Manske, is it Manske or Mansk? Manske, Your Honor. Good morning, Your Honors. May it please the Court, William Manske for U.S. merchants. I look forward to addressing the issues raised by counsel and certainly this panel's question, but if you'll pardon me, I'd like to provide a little context on this long case. This appeal is the result of extensive litigation in fact finding below. The case was filed by Presto in 2018. At the time that it was filed, Presto asserted a laundry list of claims. Most of those were dismissed at summary judgment. Following summary judgment, the district court took inventory of the remaining few claims, Presto's theory of recovery on those claims, and made the correct decision to proceed with a bench trial on Presto's only remaining trade dress claim. At trial, over the course of six days, the district court heard testimony from 17 witnesses, including Costco, who's an important third party in this case, and admitted over 150 exhibits. Then the district court entered its findings of fact and conclusions of law in a 92-page order, which found that Presto failed to meet its burden to show trade dress infringement, and it failed on every element of that claim. What Presto claims is error below is in fact the result of the district court's careful consideration of the extensive record in this case, a record developed over the course of five plus years of litigation. I'd like to turn first to the jury trial issue and the Seventh Amendment challenge. And Judge Erickson, I think you framed kind of the threshold question correctly, which is what is the theory of recovery that was advanced here by Presto? What was the proof that was actually put in? Now, our contention is that throughout this case, Presto was crystal clear that it sought discouragement only, the complaint, the interrogatories. And then certainly in its expert report, which it then put in through trial testimony, and in that expert report, Judge Erickson, you identified the context of a discouragement theory and how that works under Lanham Act. There are certain causal presumptions associated with economic harm. Presto relied on those causal presumptions in asserting its discouragement theory. That's what its expert articulated in its report. That's what its expert testified to at trial. That was the theory. Prior to trial, to the extent that there's any question here, Presto, in front of Judge Nelson, confirmed that its only theory of economic recovery in this case is discouragement. Counsel, I think we all agree that discouragement is typically an equitable remedy. But it seems to me this is a case where we have to deal with the profits as proxy for damages theory. I mean, that's really what it comes down to. In the Black and Decker case, it seems to me the most important part of that case was its treatment of the primacy of the Constitution. If wherever there's an ambiguity, why wouldn't we follow the strong and historic favoring of a jury trial? So a couple things there, Your Honor. First, I don't think this is a case where you have to get into a profits as proxy theory, which is a spirit, a theory of actual damages, because that is not what we submit, Presto, articulated. The Black and Decker case. So the Black and Decker case is a district court case out of the Seventh Circuit. And it did examine whether or not there was sufficient kind of evidence of a profits as proxy theory to submit then that to the jury in an advisory context. Now, what's critical there, because profits as proxy are an actual damages theory, there was an articulation of a specific harm. There was evidence to connect that harm to the violation, the trade dress violation alleged there. There was a declaration from the plaintiff's marketing executive talking about the conditions of sale. And critically, there was a survey in that case that articulated in that case how there was a sales diversion directly attributable to the alleged violation. None of that evidence is present here, again, because the theory of recovery that comes with that. And on the Seventh Amendment question, I think the district court's analysis of the Seventh Amendment question he presented here is straightforward and correct. So what the Seventh Amendment question does is it looks at first the nature of the claim and the historic treatment of that, and then the nature of the remedy sought. In here, the court is said and told that the nature of the remedy sought is the more important of those two analyses. What the court did here is it looked at all of the evidence I just articulated for you, Your Honors, and said the nature of the remedy sought here is clearly disgorgement. Disgorgement is historically an equitable remedy. And in the context of a trade dress claim, the district court was able to look at a wealth of authority, the leading treatise on this, on trademark non-fair competition, McCarthy, a variety of appellate courts, including the Hard Candy Court in the 11th Circuit, amongst a number of others that have confided this and concluded, consistent with historic treatment, that disgorgement is an equitable remedy. Roberts, I guess some concerns with your theory is that the unique facts that we have here. Not only do we have two direct competitors, but the alleged infringer and the plaintiff had an exclusive arrangement with a single distributor. It seems to me that if the profits for proxy theory would apply anywhere, it would be in this situation, because a lost sale to Presto is, there's a one-to-one correlation between a lost sale and a gained sale. You've just got two direct competitors in an exclusive market. Yes. So the profits as proxy cases do talk about kind of a direct competition. What those cases are ultimately getting at is a need for some profit equivalency, evidence of profit equivalency, to rely on an inference that the measure of profits is a one-for-one. And here, I don't think you have that. First and foremost, the parties' products were sold at different prices and they had different margins. And that's a fact known from the beginning of this case. The Court cited that in its November 10, 2021, order, that fact. And it got that fact from Presto's complaint. Beyond that, and critically here, Presto's big kind of retroactive recasting of its theory as a profits by proxy relies on this idea that it lost its contract at Costco because of U.S. merchants. It doesn't tie its losing of its contract at Costco to the violation here, which would be the critical component for a profits at proxy theory. But beyond that, the evidence of the record here is that Costco decided not to do business with Presto for reasons having nothing to do with U.S. merchants. The relevant kind of area is the Arizona Costco warehouses where Presto is claiming that it was usurped. The year before U.S. merchants were even on the scene, Presto decided not to carry, sorry, Costco decided not to carry Presto's product. And we know why that is. The Court cited this in its fighting the fact. Costco was unsatisfied with Presto's sales. Costco was unsatisfied with the requirements that Presto attempted to place on it in terms of where it located Presto's product and whether it would allow Presto employees to come in and check that sale display. And then beyond that, and I mentioned at the top of this that we have significant testimony from Costco. We have direct testimony from Costco about why they didn't go with Presto. And that is at — So that's all true, but it's also true that the record shows that Costco insisted that they copy Presto's product. I don't know that I agree with — You projected an earlier version that didn't have the bunch-shaped screen. Yes. So Costco's instruction on the record to U.S. merchants was to create an improved product, and I agree that over time that that product evolved. But I think what's kind of critical here on this copying idea, and I would turn to — I would look at inward — there's a lot here that happens in this case in terms of development of the actual rights that Presto has. So, one, factual, the grills are different, and the District Court did observe that. They have different sizes. They have different safety rings. But I do agree, even if they do appear the same, the fact of the matter is the District Court found that the grill itself is functional. And the Supreme Court has said in Inwood that reproduction of a functional element is a legitimate competitive activity. So the fact of the matter is there is no right in the bunch-shaped grill, and it's functional for safety reasons, as the District Court found. Ultimately, on the Seventh Amendment question, what Judge Loken described as a second run at the apple is what is happening here? So Presto is trying to recast retroactively its theory of recovery to try to get this case back down and have a second chance at a jury trial. If the Court has no other questions on the Seventh Amendment question, I'll just briefly address the merits. Presto's counsel touched on the merits issues very briefly in his argument. As I mentioned at the top of mine, the District Court found that Presto failed across all three elements of its trade dress claim. These particularly secondary meaning, likelihood of confusion, functionality, these are fact-intensive multi-factor inquiries. The District Court, again, in a 92-page order over the course of a six-day trial, reviewed all the evidence and accepted and rejected certain views of Presto, but ultimately as sitting as the fact-finder, it's entitled to do so. Presto identifies no actual factual error. It just disagrees with the arguments. And I will just touch on the copying piece, because, Judge, you raised that. I think they also disagree on the factual finding as to the functionality of the grill. I think they claim that it's just trade dress. There are other models sold without the bunt-shaped grill. In fact, USM's initial product didn't have that. It was they were told by Costco to make it look like Presto. So I agree with the contention that Presto's argument is there are other parabolic heaters that look different. That is not the functionality inquiry. The question on functionality is a legal matter is articulated and inward. The question is, is the alleged trade dress essential to the use or purpose of the product? Or does the alleged trade dress affect the quality or safety? I'm sorry, I'll make sure I get it right. Essential to the use or purpose, or does the article affect the cost or quality? In court, Presto did not do that analysis. That is the threshold functionality analysis. So there's two critical issues and failures of Presto on functionality. The first is it didn't address the central inward test, and the Court was clear on this. This is a quote from the Court's finding of fact. Presto has not produced evidence that its claimed trade dress is not essential to the use or purpose of the product or that it does not affect cost or quality. It didn't do the inward test. That's paragraph 256 of the Court's findings of fact and conclusions of law. And because it didn't do that, because what it did is it came out and said, other products don't look like ours. It didn't have a function analysis. And the evidence here actually would prevent a finding that the alleged trade dress, it does not affect quality. And we know that because Presto's expert on this, Larry Teener was in fact an employee of Presto for a very, very long time. And when he testified on cross-examination, we went through all of these documents that he was on that talk about why Presto's Bundt cake shaped grill, bulged grill, is the way it is. It's bulged. It starts here and it comes out from the center for safety reasons so that when you apply a UL safety test, you put a drape cloth over that grill, the grill, the hottest parts of the grill are far enough away from the center so that nobody gets burned and it passes the UL test. There is a plethora of evidence in the record on this from Presto itself, which would prevent a finding of non-functionality, Your Honor. With that, I see that I'm almost out of time. I think I've addressed the critical components on the merits. If the panel has any other questions. Let me ask you this. Is there any evidence or was there testimony whether either competitor was willing to do business with Costco on a non-exclusive basis? I am not aware of any testimony to that effect, Your Honor. The testimony on... Or that Costco was only willing to deal with one. That's not typical. That's correct, Your Honor. The shelves are usually filled with competitor products. The testimony on the nature of the unique contract that Presto had, what they call commitment letters with Costco, is set forth in the record. Presto's CEO, Ms. Mary Jo Cohen, testified that that's an unusual arrangement. So I think that Presto had a different type of year-to-year contractual arrangement than might be typical. Well, I can understand why a vendor with this kind of product, wanting it displayed according to its own desires, would want exclusivity. But that sort of takes away the fact that this is just two competitors with a... Looking... Competing for an exclusive relationship. Two competitors willing to do business only on an exclusive basis. That may be so. I don't know that that was developed in the record, Your Honor. I think you need to redress that because I didn't care about it. I think, Your Honor, that the main issue on the merchandising and Presto's requirements of Costco, I mean, that was primarily a focus in the terms of a secondary meaning. And that it doesn't demonstrate, it doesn't connect, and it doesn't prove for a secondary meaning. So that was how that issue came up. Okay. Thank you. Well, the case has been thoroughly briefed and well argued.